United States District Court
District of Connecticut
FILED AT HARTFORD
October 10, 2025
By R. Mayer
Deputy Clerk

THE UNITED STATES DISTRICT COURT
FOR CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF APPLICATIONS FOR CRIMINAL COMPLAINTS, ARREST WARRANTS AND SEARCH WARRANTS | Case No. 3:25mj961, 3:25mj962, 3:25mj963, 3:25mj964, 3:25mj965<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS, ARREST WARRANTS AND SEARCH WARRANTS

I, Gregory Macksoud, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being first duly sworn, herby depose and state as follows:

## INTRODUCTION

1. I am currently involved in an investigation of Antonio BAEZ, Corey LEWIS, Javon HUTLEY, and Roger MOODY for violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm and Ammunition by a Convicted Felon), 18 U.S.C. § 922(j) (Possession of a Stolen Firearm), 18 U.S.C. § 922(n) (Possession of a Firearm while under Indictment), 18 U.S.C. § 933 (Firearms Trafficking), 21 U.S.C. § 841 (Possession with Intent to Distribute and Distribution of Controlled Substances) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances) (the "Target Offenses").

2. I submit this affidavit in support of criminal complaints and arrest warrants charging BAEZ, LEWIS, HUTLEY and MOODY as follows:

a. **Antonio BAEZ**: with violations of 18 U.S.C. § 922(n) (Possession of a Firearm while under Indictment), 18 U.S.C. § 922(j) (Possession of a Stolen Firearm), 18 U.S.C. § 933(a) (Firearms Trafficking), 21 U.S.C. § 841 (Possession with Intent to Distribute and Distribution of Controlled Substances) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances).

b. **Corey LEWIS**: with violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm and Ammunition by a Convicted Felon), 18 U.S.C. § 922(j) (Possession of a Stolen

Firearm), 18 U.S.C. § 933 (Firearms Trafficking), 21 U.S.C. § 841 (Possession with Intent to Distribute and Distribution of Controlled Substances) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances);

c. **Javon HUTLEY:** with violations of 18 U.S.C. § 922(g)(1) (Possession of a Firearm and Ammunition by a Convicted Felon), 18 U.S.C. § 922(j) (Possession of a Stolen Firearm), 18 U.S.C. § 933 (Firearms Trafficking), 21 U.S.C. § 841 (Possession with Intent to Distribute and Distribution of Controlled Substances) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances); and

d. **Roger MOODY:** with violations of 21 U.S.C. § 841 (Possession with Intent to Distribute and Distribution of Controlled Substances) and 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances).

3. In addition, I submit this affidavit in support of applications for search and seizure warrants for the following three locations, four cellular devices and four individuals:

a. **22 Evergreen Avenue, Apt. B7, Hartford, CT ("Target Premises #1"):** The residential premises located at 22 Evergreen Avenue, Apt. B7, Hartford, CT ("**Target Premises #1**), which is a location associated with BAEZ and MOODY. **Target Premises #1** is described in greater detail in Attachment A to the requested search warrant. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found at **Target Premises #1.**

b. **487 New Britain Avenue, Apt. B7, Hartford, CT ("Target Premises #2)**: The residential premises located at 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**), which is a location associated with LEWIS. **Target Premises #2** is described in greater detail in Attachment A to the requested search warrant. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found at **Target Premises #2.**

c. **27 High Street, Apt. A, Vernon, CT (Target Premises #3):** The residential premises located at 27 High Street, Apt. A, Vernon, CT ("**Target Premises #3**"), which is a location associated with the acquisition of firearms on behalf of LEWIS and BAEZ. **Target Premises #3** is described in greater detail in Attachment A to the requested search warrant. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found at **Target Premises #3.**

d. **Target Telephone-1:** The cellular device with assigned telephone number **860-719-7440** ("**Target Telephone-1**"), which is subscribed to "Antonio Baez" and is used by Antonio BAEZ. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found on or within **Target**

**Telephone-1.**

e. **Target Telephone-2:** The cellular device with assigned telephone number **860-993-8586** (“**Target Telephone-2**”), which is subscribed to “Corey Lewis” and is used by Corey LEWIS. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found on or within **Target Telephone-2.**

f. **Target Telephone-3:** The cellular device with assigned telephone number **860-883-6899** (“**Target Telephone-3**”), which is used by Javon HUTLEY. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found on or within **Target Telephone-3.**

g. **Target Telephone-4:** The cellular device with assigned telephone number **860-984-0942** (“**Target Telephone-4**”), which is used by Roger MOODY. There is probable cause to believe that evidence, fruits and/or instrumentalities of the Target Offenses will be found on or within **Target Telephone-4.**

h. **Antonio BAEZ:** the person of Antonio BAEZ, who is a Hispanic male with a date of birth of XX/XX/1998[1], who is believed to reside at 22 Evergreen Ave., Apt. B7, Hartford, CT (**Target Premises #1**). This search warrant also seeks authority to secure a DNA swab from BAEZ for comparison to a DNA profile developed from the firearms, ammunition and/or narcotics packaging materials acquired during this investigation. There is probable cause to believe that a search of BAEZ’s person, and collection of a DNA sample, will yield fruits, instrumentalities and evidence of the Target Offenses.

i. **Corey LEWIS:** the person of Corey LEWIS, who is a Black male with a date of birth of XX/XX/1989, who is believed to reside at 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**). This search warrant also seeks authority to secure a DNA swab from LEWIS for comparison to a DNA profile developed from the firearms, ammunition and/or narcotics packaging materials acquired during this investigation. There is probable cause to believe that a search of LEWIS’s person, and collection of a DNA sample, will yield fruits, instrumentalities and evidence of the Target Offenses.

j. **Javon HUTLEY:** the person of Javon HUTLEY, who is a Black male with a date of birth of XX/XX/1992, who is believed to reside at 221 Sisson Ave., Hartford, CT. This search warrant also seeks authority to secure a DNA swab from HUTLEY for comparison to a DNA profile developed from the firearms, ammunition and/or narcotics packaging materials acquired during this investigation. There is probable cause to believe that a search of HUTLEY’s person, and collection of a DNA sample, will yield fruits, instrumentalities and evidence of the Target Offenses.

---

[1] The full date of birth of each of the Targets is known to the affiant.

k. **Roger MOODY:** the person of Roger MOODY, who is a Black male with a date of birth of XX/XX/1983, who is believed to reside at 22 Evergreen Ave., Apt. B7, Hartford, CT (**Target Premises #1**). This search warrant also seeks authority to secure a DNA swab from MOODY for comparison to a DNA profile developed from the firearms, ammunition and/or narcotics packaging materials acquired during this investigation. There is probable cause to believe that a search of MOODY's person, and collection of a DNA sample, will yield fruits, instrumentalities and evidence of the Target Offenses.

## BACKGROUND

4. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since April 2015. As such, I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code; that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in Section 2516 of Title 18. I have received training, both formal and on-the-job, regarding the federal firearms laws administered under Titles 18, 21 and 26 of the United States Code.

5. I have undergone various law enforcement training, including firearms, training related to conducting drug and firearms investigations, the execution of search and seizure warrants, investigative techniques, which include the collection and analysis of data obtained from search warrants. I have received specialized training in firearms identification and the investigation of firearms-related offenses. I have participated in investigations involving individuals who unlawfully possess firearms, of individuals illegally selling and trafficking firearms, and their use of cellular telephones relative to that activity. I have coordinated the controlled purchases of illegal firearms and drugs utilizing confidential sources, and undercover law enforcement officers. I have written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the illegal possession and distribution of firearms and drugs. I have conducted electronic and physical surveillance of individuals involved in illegal drug and gun possession/distribution, analyzed records documenting the purchase and sale of firearms and

illegal drugs and provided testimony, in both Grand Jury proceedings and District Court proceedings. I have also spoken with informants and suspects, as well as local, state, and federal law enforcement officers, regarding the way individuals obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs. In addition, I have been involved in the investigation of street gangs, including gangs with an international and national presence as well as locally based gangs. I have received training, both formal and on-the-job, in the provisions of the federal firearms and drug laws administered under Titles 18, 21 and 26 of the United States Code.

## PROBABLE CAUSE

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

7. I am currently assigned to the ATF Hartford Field Office. I have been investigating the illegal possession of firearms and the distribution of illegal drugs by BAEZ, LEWIS, HUTLEY, and MOODY.

### *ATF CI Information – June 2025*

8. ATF Special Agents (SA) met with an ATF Confidential Informant ("CI") who provided information related to suspected armed drug traffickers in the area of 15 Evergreen Avenue in Hartford, Connecticut. ATF conducted surveillance at 15 Evergreen Avenue and obtained photographs of individuals observed outside of the apartment building located at that address. Photographs were shown to the CI, and one of the individuals was preliminarily identified by CI as "FATBOY." ATF spoke with a Hartford Police Department (HPD) Detective, who was

shown the same photograph provided to the CI, and stated that the person identified by CI as "FATBOY" was in fact "Antonio BAEZ," with the associated alias of "FATBOY."

***June 5, 2025 - Undercover Purchase of Fentanyl from BAEZ at 15 Evergreen Avenue***

9. On June 5, 2025, an ATF SA acting in an undercover capacity (UC#1) drove an undercover vehicle (UCV) to 15 Evergreen Avenue with the intention of purchasing drugs from BAEZ. UC#1 was equipped with recording equipment and given pre-recorded ATF Agent Cashier funds. Upon arrival, BAEZ met UC#1 on the street and UC#1 inquired about purchasing a "half a stick." Through training and experience, investigators know a "half a stick" is common drug vernacular used to describe five (5) bundles of glassine bags or fifty (50) glassine bags containing fentanyl. BAEZ requested a separate individual located at the front of 15 Evergreen to get him a half a stick and confirmed with UC#1 that it would cost $125 for the drugs. BAEZ asked UC#1 for a phone number and UC#1 provided an undercover number to BAEZ. BAEZ subsequently called the phone number that UC#1 provided him and told UC#1 to call BAEZ when he planned on coming back and "anytime you need us come up here." The number that appeared on UC#1's phone when BAEZ called was **860-719-7440** (**Target Telephone-1**).




*BAEZ outside of 15 Evergreen – June 5, 2025*

10. An unidentified male (later identified as Corey LEWIS) then approached the UCV and provided UC#1 with five (5) bundles of glassine bags secured with rubber bands, through the passenger window of the UCV. After securing the five (5) bundles, UC#1 inquired about purchasing five (5) additional bundles and agreed with BAEZ on a total price of $250 for the drugs. After this request, BAEZ told LEWIS he could get the additional drugs from the front seat of a vehicle parked in front of the UCV. After, LEWIS was seen going into the front seat of the vehicle, he returned to the UCV and provided UC#1 with an additional five (5) bundles of glassine bags.




*LEWIS providing UC#1 with five (5) bundles of suspected fentanyl*

11. BAEZ stated they also had "loose". Through training and experience, investigators know this to be a term used to describe raw fentanyl. UC#1 inquired how much a gram was and BAEZ stated $80 per gram. BAEZ asked LEWIS if he had any grams on him, and LEWIS affirmed and then proceeded to enter the passenger side of the UCV, producing a clear plastic bag containing a substance consistent with raw fentanyl. UC#1 provided LEWIS with a scale, which LEWIS used to weigh the suspected fentanyl. While doing so, LEWIS stated "Be careful, with the raw." Investigators understood LEWIS to be stating raw fentanyl was more potent or stronger than other forms of fentanyl, because it had not been "cut," or mixed with anything to weaken the substance. LEWIS informed his name to be "CITY," and described being from the Bronx, New York. LEWIS then stated "The bags are good… I'm just trying to tell you; this shit is fire but be careful with it." Through training and experience, investigators believe LEWIS was stating the raw fentanyl was stronger than the substance in the glassine bags. A total of approximately 23.6 grams of fentanyl (with packaging) was purchased from BAEZ and LEWIS for $330.00 dollars.




*LEWIS counting money after a fentanyl exchange with an ATF UC on June 5, 2025*

12. UC#1 observed the drugs to weigh approximately 1.2 grams. UC#1 placed the drugs in a plastic baggie and secured them in the driver's door of the UCV. UC#1 provided LEWIS with $80 in ATF funds in exchange for the suspected fentanyl. After the transaction, while LEWIS was exiting the UCV, BAEZ stated "Anytime you need me just call me." UC#1 then departed the area.

***ATF CI Debrief – June 6, 2025***

13. On June 6, 2025, ATF Investigators met with the ATF CI previously mentioned herein and showed CI a few still-shot photographs taken from the undercover transaction that occurred at 15 Evergreen the day before. An unidentified photograph of BAEZ was immediately recognized by CI as "FATBOY." An unidentified photograph of "CITY" was shown to the CI, who immediately recognized the individual as Corey LEWIS, who CI also knew as "CITY." Additionally, investigators obtained DMV photographs of both Corey LEWIS and Antonio BAEZ, which are shown below:




*Antonio Baez* *Corey Lewis*

***June 16, 2025 – Undercover Purchase of Fentanyl from BAEZ***

14. On June 16, 2025, an ATF SA acting in an undercover (UC#1) capacity, was provided with pre-recorded ATF funds. In addition, UC#1 was equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated the acquisition of "seven", which UC#1 intended to be seven (7) grams of powder fentanyl.

15. UC#1 inquired with BAEZ about the purchase of seven (7) grams, however, BAEZ stated: "I don't got no loose, I got it bagged up, I just bagged it up". UC#1 understood BAEZ to be stating he did not have raw fentanyl, rather BAEZ had just placed or packaged the fentanyl into the glassine bags. BAEZ then indicated to UC#1 that the substance had not been cut.

16. Continuing, BAEZ informed UC#1 that he (BAEZ) had thought UC#1 wanted to purchase seven (7) "buns" when they spoke over the telephone. Through training and experience, investigators know "buns" is a street slang for bundles. UC#1 asked BAEZ how long it would be for BAEZ to be able to acquire the drugs. BAEZ then initiated an outgoing call on his telephone,

wherein he inquired with the individual about the acquisition of seven (7) grams. Once BAEZ terminated the telephone call, BAEZ told the Unidentified Male (UM#1): "Hey yo I am going to need you to go to City for me". Investigators know from experience in this case that "CITY" is a street name for Corey LEWIS, a co-conspirator of BAEZ. BAEZ stated that if UC#1 gave UM#1 a ride to acquire the drugs, he (BAEZ) would provide UC#1 with some "extra". UC#1 asked how far away LEWIS was and BAEZ responded, "it's not far…you know New Britain Ave?...it's like white side...they aren't really on it over there." Through training, experience and information learned during this investigation, affiant believes that these statements by BAEZ mean that he wanted UC#1 to drive UM-1 over to LEWIS's residence, which is located at 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**), to procure more fentanyl (specifically 7 grams). Additionally, when BAEZ stated "it's like white side…they aren't really on it over there", BAEZ was telling UC#1 that a large portion of the demographic living at or near LEWIS's residence at 487 New Britain Ave, Hartford, CT (**Target Premises #2**) was white, and therefore naïve to the criminal activity taking place and not attracting the attention of law enforcement at or in the area of 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**).

17. After the phone call, BAEZ informed UC#1 that "he" (suspected to be LEWIS) would arrive in ten minutes. Neither ATF surveillance units, nor UC#1 observed LEWIS arrive at Evergreen Avenue. Eventually, BAEZ informed UC#1 that he had 3 grams at the location. BAEZ came to the passenger side door of the UCV and asked UC#1 for a scale. UC#1 placed a scale on the front passenger floorboard and BAEZ placed a clear plastic bag of white substance onto the scale. UC#1 observed the scale to read an approximate weight of 2.9 grams. UC#1 then took possession of the suspected fentanyl and secured the baggie within the UCV.

18. UC#1 then provided $220 in ATF purchase funds to BAEZ in exchange for the

suspected fentanyl. While doing so, BAEZ stated: "Next time you need grams just let me know and if you need something else by today, I'll have some more". Regarding future transactions, BAEZ informed UC#1 to utilize the letter "I" followed by the number of grams that UC#1 was seeking to acquire, when texting with BAEZ. UC#1 acknowledged, and BAEZ closed the door to the UCV. UC#1 observed BAEZ walk back towards the front porch of 15 Evergreen Avenue. UC#1 purchased a total of 3.2 grams of fentanyl for $220.00 dollars.

***June 24, 2025 – Undercover Purchase of Fentanyl from BAEZ***

19. On June 24, 2025, an ATF Special Agent (SA) acting in an undercover capacity (UC#1), was provided with pre-recorded ATF funds. In addition, UC#1 was equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**, requesting 10 grams of powder fentanyl. BAEZ informed UC#1 that he (BAEZ) had the product and UC#1 could come meet him to conduct the transaction.

20. Upon UC#1's arrival at 15 Evergreen Avenue, BAEZ proceeded to walk towards the UCV. BAEZ entered the front passenger seat of the UCV and produced a clear plastic bag of white/gray substance consistent with powder fentanyl. UC#1 took possession of the fentanyl and placed the baggie on a scale, which read approximately 12-13 grams. UC#1 asked BAEZ if the drugs were "hitting good" (through training and experience investigators know this to be UC#1 asking if the drugs were of good quality), which BAEZ responded: "Hell yeah and that's raw I ain't cut it or nothing". Through training and experience, investigators understood this to be BAEZ stating the fentanyl had not been mixed with a cutting agent to weaken the strength or potency of the fentanyl. BAEZ continued to state UC#1 could add a cutting agent to the product without

reducing the quality.




*BAEZ providing suspected fentanyl to UC#1*

21. Initially, BAEZ stated the price of the fentanyl to be $800, but ultimately, BAEZ stated that UC#1 could purchase the fentanyl for $700 since UC#1 had consistently dealt with BAEZ. UC#1 provided BAEZ with $700 in ATF funds and informed BAEZ that UC#1 dealt with "power tools" (firearms), which BAEZ responded: "Alright bet, so anytime you get something just hit me up, I buy all that shit". UC#1 responded that UC#1 was actually interested in purchasing firearms, which BAEZ affirmed, stating they could discuss that as well. BAEZ also stated he (BAEZ) would just have UC#1 "pull up" rather than discuss over the telephone. Through training and experience, investigators know people who illegally deal in firearms to be more comfortable speaking about them in person as opposed to over the phone, for fear of law enforcement being able to actively or retroactively use the discussion and coordination of firearms on the phone against them. BAEZ then exited the UCV and stated the parties would talk soon. UC#1 ended up purchasing approximately 12.8 grams of fentanyl from BAEZ for $700.00 dollars.

***<u>July 3, 2025 – Undercover Purchase of Fentanyl from BAEZ</u>***

22. On July 3, 2025, ATF Special Agents (SA) acting in an undercover capacity (UC#1

& UC#2) were provided with pre-recorded ATF funds. In addition, UC#1 and UC#2 were equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated the acquisition of 15 grams of powder fentanyl. BAEZ informed UC#1 that he (BAEZ) had the product and UC#1 could come meet him to conduct the transaction.

23. Upon arrival at Evergreen Avenue, UC#1 and UC#2 observed BAEZ standing outside of the building at 15 Evergreen Avenue, along with additional unidentified individuals. The UCs parked the UCV in the driveway of 15 Evergreen and BAEZ proceeded to walk towards the rear of the building. BAEZ reappeared and stood next to the front passenger side of the UCV producing a clear plastic bag of white substance consistent with powder fentanyl. UC#2 placed the baggie on a scale, which read approximately 13.7 grams, which was then relayed to BAEZ. BAEZ apologized stating: "My fault". Investigators believe BAEZ was acknowledging that the agreed upon amount was 15 grams and the amount being given to the ATF UCs was less than that, at 13 grams.

24. UC#1 then showed BAEZ two (2) ATF Glock prop firearms and BAEZ inquired as to how much UC#1 was purchasing the firearms for and touched the ATF Glock prop firearm to confirm it was not a "Ghost" gun and ensure that it was not plastic, which BAEZ agreed that it was not. BAEZ said: "I don't fuck with the ghosts I fuck with the real shits." BAEZ retrieved the fentanyl and advised that he was going to add more. BAEZ ran towards the rear of 15 Evergreen Avenue with the fentanyl.

25. BAEZ returned from the rear of the building and provided UC#1 with the fentanyl.

While conversing, UC#1 advised they had two firearms and were looking to acquire a third firearm. BAEZ explained that UC#1 would not want to pay the price that BAEZ paid and said that he purchases the firearms for $900 that come with "Sticks." Investigators are aware that slang terminology for extended pistol magazines are sticks. BAEZ added that he did not like doing transactions with both, referring to drugs and firearms, because BAEZ did not want to get "Indicted." Additionally, BAEZ requested to use the UC's scale. BAEZ placed what appeared to be a white rocklike substance (believed to be crack cocaine) on the scale and BAEZ then provided the suspected crack to another unidentified individual, who was a suspected narcotics customer of BAEZ.

26. UC#2 weighed the fentanyl which revealed the weight was approximately 14.9 grams. BAEZ agreed to sell the fentanyl for $950. Additionally, BAEZ asked UC#1 when the next time UC#1 would be down and advised that he would have two (2) of "those" (referring to firearms) for UC#1. UC#1 told BAEZ he would text him one day in advance so that BAEZ could have the firearms ready for UC#1. ATF UCs ended up purchasing approximately 15 grams of fentanyl for $950.00 dollars

***July 9, 2025 - Undercover Purchase of Firearm and Fentanyl from BAEZ***

27. On July 9, 2025, two (2) ATF SAs acting in an undercover capacity (UC#1 and UC#2) drove an undercover vehicle (UCV) to 15 Evergreen Avenue with the intention to purchase 20 grams of fentanyl from BAEZ. UC#1 and UC#2 were equipped with recording equipment and given pre-recorded ATF funds. Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**.

28. When the ATF UCs arrived and met with BAEZ (outside of 15 Evergreen Avenue), BAEZ asked UC#1 what kind of "pipes" he was looking for. Investigators are aware through

training and experience that "pipes" is common street vernacular for firearms. BAEZ explained that he could obtain a Ruger pistol in approximately five (5) minutes. Additionally, BAEZ told UC#1 that the Ruger was a nine-millimeter (9mm). BAEZ said that the price for the Ruger was $900 and that another individual had the pistol, but all business would go through BAEZ. BAEZ proceeded to call an unknown individual regarding the sale of the firearm. Shortly thereafter, BAEZ told the UCs that the individual was on the way. UC#1 and BAEZ began conversing and BAEZ told UC#1 that he had a .40 caliber (firearm) with a "stick" on it, but BAEZ would not sell it. Investigators are aware that slang terminology for extended pistol magazines is "sticks." BAEZ said that he could get almost anything UC#1 asked for depending on what price UC#1 wanted to pay for firearms. Investigators believed BAEZ to be offering an array of firearms that he could acquire and sell and that it depended upon what UC#1 wanted to pay for the firearms. BAEZ explained to UC#1 that if they were conducting business he did not want anything to come back on him because he is already on "papers," as BAEZ looked down at his court ordered GPS monitored ankle bracelet. Investigators believe through training and experience that the term "papers" in this context is used to explain individuals who have a current criminal case.

29. UC#1 asked BAEZ if he dealt with the "hard" (through training and experience investigators know this term to refer to crack cocaine). BAEZ answered that he only dealt with "hard" and "fent," otherwise known to investigators as fentanyl. UC#1 inquired about the price for an ounce of crack cocaine, which BAEZ estimated $700.

30. BAEZ continued conversing with UC#1 and asked if UC#1 ever traveled to Vermont. BAEZ further inquired about UC#1 trafficking drugs to Vermont on BAEZ's behalf. BAEZ told UC#1 that he would pay for the rental, room, food, and requested UC#1 bring back his "bread," known to investigators through training and experience, as slang terminology for money.

BAEZ said that he would have it already "bagged up" and all UC#1 would have to do is answer the door and phone. Furthermore UC#1 would receive a portion of the money for transporting the drugs.

31. Corey LEWIS appeared from the rear of the driveway and approached BAEZ. BAEZ and LEWIS spoke in front of the UCV. When BAEZ returned with LEWIS, BAEZ asked UC#1 if he dealt with rifles. UC#1 explained that it depended on what the rifle looked like, and LEWIS said that it had a scope on it and that it took "AK" bullets. UC#1 asked LEWIS if he had a photograph of the rifle and LEWIS said he does not take photographs because they stay in the "archive," which investigators believed LEWIS to be referencing either cloud-based storage or internal storage on a cellular telephone. LEWIS said that the rifle had a "clip," and that you put it in and shoot it, which LEWIS demonstrated by pretending to bring a rifle to his shoulder. UC#1 told LEWIS that he would not be able to purchase the rifle at this time but would purchase the rifle next time.




*Photo of LEWIS and BAEZ on 7/9/25*

32. BAEZ mentioned that he had a rusty "clip," referring to a firearm magazine and motioned toward the building at 15 Evergreen Avenue. LEWIS told BAEZ that he (BAEZ) should have purchased a gun kit from an unknown individual, and BAEZ replied that he wasn't supposed to have that in his residence and stated, "I be wildin with all the grams and shit," which investigators believed to be BAEZ referring to having an unknown quantity of suspected drugs inside his apartment. BAEZ clarified that it was a metal, thirty (30) round magazine. BAEZ told UC#1 that he had an "FN" (known to investigators as an acronym normally used to describe firearms by Fabrique Nationale), which he was not going to sell. BAEZ described the FN firearm as having a bag on it to catch brass and that he paid $1,700 for it. BAEZ told UC#1 that his FN firearm was too hard to find and if he were to sell it that it would be because he was desperate.

33. BAEZ then recognized an individual, whom he called "PHAZO," approaching in a silver sedan, indicating that the firearm had arrived. BAEZ returned to the UCV after speaking with the operator of the silver sedan and handed UC#1 a small black bag which ultimately contained a Ruger, model P89, 9mm pistol bearing serial number 310-96153. During this transaction, UC#1 observed the driver and source of the firearm to be a black male, short beard, wearing earrings.



***BAEZ providing black bag containing Ruger pistol to UC#1 in UCV***

34. BAEZ believed there may have been a round in the chamber. UC#1 removed the magazine which contained ammunition (later identified as eight rounds of 9mm caliber ammunition) and ensured there was not a round in the chamber. While manipulating the pistol, UC#1 asked BAEZ if they could pay $800. UC#1 also inquired if BAEZ would make any money from the sale of the firearm. BAEZ told UC#1 that he would not be receiving any money from the sale of the firearm and briefly returned to the silver sedan. UC#1 handed the pistol and magazine to UC#2 who placed the magazine in the passenger door pocket and the pistol underneath the passenger seat of the UCV. UC#1 returned the small black bag which contained the pistol to BAEZ. UC#1 handed BAEZ $800 in ATF funds. BAEZ returned to the silver sedan with the $800 in ATF funds. Upon returning to the UCV, BAEZ told UC#1 that the individual he was waiting for to bring

the fentanyl was approximately four (4) minutes away. BAEZ told UC#1 that he had ten (10) grams and that the other individual needed to bring the other ten (10) grams.

35. Shortly thereafter, UC#1 observed a silver 4-door sedan arrive and park in front of 15 Evergreen Avenue. UC#1 observed the vehicle to be solely operated by a black male wearing a Pittsburg Pirates baseball cap (hereafter "SOS#1"). At the same time, BAEZ yelled to LEWIS to put that in a bag for him, which investigators believed that BAEZ was directing LEWIS to obtain the fentanyl from SOS#1 and place it in a bag for the ATF UCs. LEWIS approached the vehicle for a short duration, then proceeded to walk towards the rear of 15 Evergreen Avenue. UC#1 understood LEWIS to obtain the drugs from SOS#1 and go inside of the building to accurately weight and package the additional ten (10) grams the UCs sought to purchase.

36. BAEZ told UC#1 that the next time they came BAEZ would have other firearms for sale, possibly larger caliber firearms. BAEZ said that he would not sell UC#1 anything that was "dirty," which investigators believed BAEZ to mean a firearm that was previously used in a crime and/or stolen. BAEZ went on to say that if UC#1 gave BAEZ two (2) weeks' notice, BAEZ could obtain firearms from an individual from North Carolina. Additionally, BAEZ described the individual who could purchase the firearms as an old, white veteran. BAEZ told UC#1 that they could go with the individual to the store in North Carolina and purchase the firearms. According to BAEZ, the unknown individual had an address in North Carolina but resided in Connecticut. BAEZ told UC#1 that it was a twelve (12) hour ride, referring to North Carolina. UC#1 could provide an order of firearms to the individual who would go to North Carolina to purchase them and return to Connecticut within approximately two (2) days.

37. BAEZ received a telephone call and after brief conversation, UC#1 confirmed with BAEZ that he needed a scale, which UC#1 provided to BAEZ. The UCs entered the hallway on

the north side of 15 Evergreen Avenue. Once inside of the hallway, BAEZ came through a secondary door and provided UC#1 with two (2) clear plastic baggies which contained an off-white powdery substance believed to be fentanyl that weighed approximately nineteen (19) grams. BAEZ agreed to sell the suspected fentanyl for $1,200. UC#2 handed $1,200 in ATF funds to BAEZ, which BAEZ counted and accepted.

***July 22, 2025 – Undercover Purchase of Fentanyl from BAEZ***

38. On July 22, 2025, ATF Special Agents (SA) acting in an undercover capacity (UC#1 & UC#2) were provided with pre-recorded ATF Purchase funds. In addition, UC#1 and UC#2 were equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated the acquisition of 20 grams of powder fentanyl from BAEZ, who stated he had to go to probation but that they would likely be able to conduct the fentanyl transaction beforehand. Additionally, UC#1 asked BAEZ about a firearm transaction previously discussed with BAEZ and Corey LEWIS. BAEZ told UC#1 seven (7), which investigators understood BAEZ was referring to the price of $700 for the firearm.

39. Upon arrival at 15 Evergreen, UCs observed BAEZ enter the driveway from the north side of the building and approach the UCV. BAEZ advised that LEWIS said the price for the firearm was $700. BAEZ said that he called LEWIS, but LEWIS did not answer and estimated that LEWIS would be awake in the next approximate hour. BAEZ told UC#1 "my shit coming in like two minutes right now," which investigators believed BAEZ to be referring to the fentanyl.

40. UC#1 inquired if BAEZ would put UC#1 in touch with the source of supply of firearms from North Carolina. BAEZ said that the individual would be around on Friday (July 25,

2025). BAEZ further advised that he could put UC#1 on a three-way call with them or UC#1 could come over if they were in the area. BAEZ expressed concern regarding his part in the firearms trafficking from North Carolina and told UC#1 it was because "that shit go federal," which investigators believed BAEZ was referring to being federally prosecuted for firearms violations. BAEZ offered to connect UC#1 with the individual from North Carolina despite his concern.

41. UC#1 asked BAEZ if the price for the twenty (20) grams would be $1,200 and BAEZ told UC#1 the price for the fentanyl was $1,300. BAEZ indicated to UC#1 that they (UC#1) were the only person he dealt with distributing fentanyl in gram quantities. While conversing, BAEZ mentioned that he had to take a urine test for probation and that he needed to purchase fake urine prior to the test. BAEZ also implied that he was not keeping anything he was not supposed to have at his residence due to his interactions with his current probation officer.

42. BAEZ told UC#1 that the individual bringing the fentanyl was pulling up and exited the driveway. At the same time, UC#1 observed a black Nissan sedan park at the Mobil gas station across the street from 15 Evergreen Avenue. BAEZ returned to the UCV and asked the UCs if they had a scale. BAEZ provided UC#1 with one (1) clear plastic bag which contained an off-white powder substance believed to be fentanyl that weighed approximately twenty-six (26) grams (ultimately weighed by ATF at approximately 26.4 grams). BAEZ had an additional clear plastic bag protruding from his front pants pocket.

43. BAEZ agreed to sell the suspected fentanyl for $1,450. UC#1 inquired about BAEZ's involvement of his distribution of crack cocaine. BAEZ indicated he trafficked amounts of crack cocaine to Vermont as previously discussed. UC#2 handed $1,450 in ATF Purchase funds to BAEZ. It should be noted that after the narcotics transaction with BAEZ, UC#1 conducted a recorded telephone call with BAEZ, via **Target Telephone-1**, during which, BAEZ informed

UC#1 that LEWIS would not be available until later, regarding the sale of the firearm. UC#1 told BAEZ they would contact him later which concluded the telephone call.

***July 28, 2025 - UC Purchase of Fentanyl & Firearms from BAEZ, LEWIS & HUTLEY***

44. On July 28, 2025, ATF Special Agents (SA) acting in an undercover capacity (UC#1 & UC#2) were provided with pre-recorded ATF funds. In addition, UC#1 and UC#2 were equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated a 20-gram fentanyl transaction with BAEZ.

45. Upon arrival at 15 Evergreen Avenue, UC#1 noticed that BAEZ was standing outside of the building on the side stairwell. The UC's entered the landing on the side stairwell and engaged BAEZ in conversation. While conversing with BAEZ, Corey LEWIS arrived on the side stairwell for a short time before leaving. BAEZ told UC#1 that the fentanyl would be there in five (5) minutes. UC#1 and BAEZ discussed drug trafficking to Vermont. BAEZ said that some of his spots were in the middle of Vermont and discussed ways to evade law enforcement while trafficking drugs up to Vermont, such as wearing construction clothing and driving non-tinted vehicles without Connecticut license plates. BAEZ also told UC#1 that he would initiate a three-way FaceTime call with UC#1 and the North Carolina firearm source of supply later. BAEZ told the UCs he unknowingly drove an unregistered vehicle fourteen (14) hours to North Carolina. BAEZ was stopped by the police and advised that his vehicle was unregistered. BAEZ alluded that he was concerned with the encounter with the police due to having “Hella shit on me,” which investigators believed BAEZ was referring to drugs and/or firearms.

46. While conversing, LEWIS returned to 15 Evergreen Avenue with a dark colored

bag protruding from his pocket and provided BAEZ with a set of keys. Prior to LEWIS's departure, the UC's understood that LEWIS left to obtain the drugs on behalf of BAEZ. LEWIS entered the building through the side door of the landing and BAEZ could be heard saying "In the kitchen gang," which investigators believed BAEZ to be directing LEWIS to obtain a scale to weigh drugs, which was located inside the kitchen of BAEZ's apartment. BAEZ told the UCs "He's scaling it up right now," which investigators believed BAEZ was referring to LEWIS weighing the suspected fentanyl for the UCs to purchase. BAEZ entered the door that LEWIS previously entered and told UC#1 to bring their scale. UC#2 retrieved the scale from the UCV and the UCs entered the hallway. BAEZ provided UC#2 with a clear plastic bag which contained an off-white powdery substance believed to be fentanyl that weighed approximately twenty-one (21) grams. BAEZ agreed to sell the suspected fentanyl for $1,300. BAEZ directed LEWIS to obtain the money from the UCs, and UC#2 handed LEWIS $1,300 in ATF funds.

47. While UC#2 was weighing the suspected fentanyl, UC#1 inquired if LEWIS had the previously mentioned firearm for sale. LEWIS advised that the firearm was located on Albany Avenue and that he would make a call to obtain the firearm. LEWIS and BAEZ discussed logistics of obtaining the firearm and BAEZ told LEWIS that he had a blanket to conceal the firearm. LEWIS described the firearm as a rifle with a scope. Shortly thereafter, LEWIS exited the side door with a blanket and walked towards the driveway. BAEZ returned to the landing and advised that LEWIS had left to obtain the firearm. Additionally, UC#1 and BAEZ discussed BAEZ's proposed delivery of drugs to Vermont. BAEZ again mentioned that all UC#1 would have to do is drop and pick up, referring to dropping off drugs and returning with money.

48. LEWIS returned to 15 Evergreen Avenue in a blue Nissan Rouge that parked behind the UCV. LEWIS opened the rear hatch and retrieved a blue bin with the blanket on top. LEWIS

loaded the bin in the back seat of the UCV. UC#1 opened the bin inside of the UCV and retrieved a black bolt action rifle with a scope, later identified as a Mossberg, model Patriot, 30-06 caliber bolt action rifle bearing serial number #MPR0486896. The rifle also came with a magazine which included five (5) rounds of .30-06 caliber ammunition. UC#1 handed LEWIS $700 in ATF purchase funds.



*LEWIS transferring a rifle to ATF Undercovers – July 28, 2025*

49. The UCs then entered the UCV and BAEZ asked UC#1 if they wanted something else, referring to an additional firearm. BAEZ instructed UC#1 to wait and proceeded to yell to an unknown Black male, later identified as Javon HUTLEY. The UC's exited the UCV and returned to the side stairwell with BAEZ and HUTLEY.

50. While in the side stairwell, HUTLEY produced a teal and silver pistol (later identified as a Ruger, model EC9s, 9mm caliber semi-automatic pistol bearing serial number #461-22222). HUTLEY unloaded the pistol and handed it to UC#1. HUTLEY told UC#1 that he had "all the guns they need." HUTLEY agreed to sell UC#1 the pistol for $900. HUTLEY also told UC#1 that he had other firearms with "beams" (known to investigators through training and experience to be slang terminology for a flashlight and/or laser), "sticks" (known to investigators

to be slang terminology for extended pistol magazines), and "vests" (which investigators believed HUTLEY to be referring to ballistic vests). UC#1 handed HUTLEY $900 in ATF funds, which HUTLEY counted. HUTLEY asked to reacquire the pistol, which UC#1 allowed. HUTLEY entered the previously mentioned door off the landing to wipe his fingerprints off the pistol. While HUTLEY and UC#1 were inside of the hallway, HUTLEY told UC#1 that he couldn't have his prints on it and explained that if he knew he was going to sell the pistol he would have already wiped the pistol down. UC#1 further inquired if the pistol shot, which HUTLEY replied, "of course, you think ima have it out here and it don't shoot?" Prior to exiting the hallway, UC#1 provided HUTLEY with the $900 in exchange for the pistol. The UCs then returned to the UCV.




*Javon HUTLEY in Possession of a Ruger Pistol on 07/28/2025*

***August 7, 2025 – Undercover Purchase of Suspected Fentanyl from BAEZ***

51. On August 7, 2025, ATF Special Agents (SA) acting in an undercover capacity (UC#1 & UC#2) were provided with pre-recorded ATF funds. In addition, UC#1 and UC#2 were

equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated the acquisition of 20 grams of fentanyl. Additionally, UC#1 referenced purchasing firearms from Javon HUTLEY and BAEZ informed UC#1 that they would have something for UC#1.

52. Upon arrival, UCs entered the northside landing of 15 Evergreen and knocked on the exterior side door to notify BAEZ of their presence. BAEZ greeted the UCs at the side door and walked down the driveway towards the front of 15 Evergreen Avenue. UC#1 observed BAEZ at the driver side window of a gray/silver sport utility vehicle (SUV) that entered the driveway at 15 Evergreen Avenue. BAEZ returned to the side landing through a different side door and provided UC#1 a clear plastic bag which contained an off-white substance consistent with powder fentanyl, which weighed approximately 23 grams. UC#2 informed BAEZ there were approximately 23 grams and BAEZ agreed to sell the suspected fentanyl for $1,400. UC#2 handed BAEZ $1,400 in ATF funds.

53. During the transaction, BAEZ told UC#1 that he had two (2) Glock model 22's for sale, but the individual who was selling the firearms was in Massachusetts. UC#1 was able to determine that the individual who was selling the firearms was in fact HUTLEY, and BAEZ told UC#1 that HUTLEY wouldn't be back from Massachusetts for approximately one (1) hour. BAEZ said that he would call UC#1 in approximately ten (10) minutes to confirm when HUTLEY would return.

54. While the UCs were exiting the hallway, LEWIS arrived on the landing. After greeting LEWIS, UC#1 fictitiously told LEWIS that they made $100 from the sale of the firearm

LEWIS previously sold to UC#1 during a transaction on July 28, 2025. UC#1 and BAEZ exchanged SMS text messages after the transaction and BAEZ inferred that HUTLEY would not be available for the firearms transaction.

***August 19, 2025- Undercover Purchase of Fentanyl from BAEZ and Roger MOODY***

55. On August 19, 2025, an ATF SA, acting in an undercover capacity (UC#2), was provided with pre-recorded ATF purchase funds. In addition, UC#2 was equipped with audio/video recording and transmitting devices. For the duration of the operation, the UC#2 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**.

56. Upon arrival, UC#2 entered the northside landing and knocked on the exterior side door. BAEZ did not respond to UC#2, which prompted UC#2 to call BAEZ. UC#2 informed him that they were outside. BAEZ greeted UC#2 at the side door with another unidentified individual, later identified as Roger MOODY (MOODY). BAEZ was holding a bag of fentanyl and a scale.



*Roger MOODY standing next to BAEZ during fentanyl sale to ATF UC on 08/19/25*

57. While inside of the hallway, BAEZ placed the scale on the ground and weighed the

suspected fentanyl. BAEZ advised that the weight of the suspected fentanyl was approximately 22 grams. BAEZ agreed to sell the suspected fentanyl for $1,300. UC#2 handed BAEZ a total of $1,300 in ATF purchase funds, which BAEZ accepted and counted.

58. During the transaction, UC#2 inquired if BAEZ spoke with HUTLEY about the previously mentioned firearms HUTLEY had for sale. BAEZ told UC#2 that had been a problem recently and that he (BAEZ) "can't even have no ties with that shit," which UC#2 understood that BAEZ was attempting to distance himself from police activity. BAEZ insinuated that he had other firearm sales lined up for UC#2 and implied that the firearms were expensive. BAEZ explained that he did not want to set up a firearm transaction and have the price be too high but offered to make a telephone call to inquire if there were any other firearms for sale.

59. BAEZ made a telephone call which initially sounded like the individual did not have a firearm for sale, but at the conclusion of the call BAEZ stated "1,500," which UC#2 understood to mean that the individual speaking to BAEZ possibly had a firearm for sale for $1,500. BAEZ and UC#2 conversed regarding the price of the firearm and UC#2 agreed to call BAEZ later that afternoon to see if BAEZ was able to broker a firearm sale. UC#2 and BAEZ exchanged SMS text messages after the transaction and BAEZ inferred that he might have a "Ghost" firearm for sale. Investigators are aware that "ghost" is generally slang terminology for untraceable or privately manufactured firearms (PMF). UC#2 asked about the price, which BAEZ did not confirm. UC#2 called BAEZ, but BAEZ did not answer nor return UC#2's telephone call and no firearm was purchased that day.

***August 29, 2025 – Undercover Purchase of Suspected Fentanyl from BAEZ & MOODY***

60. On August 29, 2025, ATF SAs, acting in an undercover capacity (UC#1 and UC#2), were provided with pre- recorded ATF purchase funds. In addition, UCs were equipped with

audio/video recording and transmitting devices. For the duration of the operation, the UC's utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated a previously discussed firearm transaction and twenty (20) grams of powder fentanyl. BAEZ contacted UC#1 prior to the transaction and said to park at the gas station and notify BAEZ of the UC's arrival.

61. Upon their arrival at the Mobil gas station, located at the corner of Farmington Avenue and Evergreen Avenue, UC#1 and UC#2 notified BAEZ and he requested the UCs come to building twenty-two (22) on Evergreen Avenue. BAEZ called UC#1 and advised that building 22 was on the same side of the street as the gas station. BAEZ told UC#1 that he moved from 15 Evergreen Avenue. The UC's walked to the front of building 22 and were met by MOODY, who later identified himself as "Moody."



*MOODY standing in front of 22 Evergreen on August 29, 2025*

62. The UC's entered 22 Evergreen Avenue and followed MOODY and BAEZ into the

hallway. MOODY had to use a key in his possession to allow access to the interior of 22 Evergreen to the UCs and BAEZ. MOODY and BAEZ led the UCs to an interior stairwell and, once inside, UCs took possession of a small yellow box which contained the suspected fentanyl and scale, from BAEZ, with MOODY in close proximity. UC#1 placed the baggie on a scale in the stairwell of 22 Evergreen Avenue, which weighed approximately 21 grams. UC#2 retrieved the suspected fentanyl and handed BAEZ $1,300 in ATF purchase funds.

63. During the transaction, BAEZ made a telephone call to inquire about the sale of the firearms and the individual on the telephone could be heard saying thirty (30) minutes. BAEZ told UC#1 that he (the individual BAEZ called) had one (1) Glock and one (1) Taurus for sale. The Glock was $900, and the Taurus was $800. No firearm transaction took place on this date, as BAEZ stated that the source of the firearms never arrived at 22 Evergreen. BAEZ also told the UCs that 15 Evergreen Avenue got "raided" again, which investigators believed that BAEZ was referring to the police executing a warrant, which prompted BAEZ to move to 22 Evergreen Avenue. Based on BAEZ's statements to the UCs and other information developed during this investigation, investigators believe that BAEZ moved from 15 Evergreen Ave. to 22 Evergreen Ave., Apt. B7, Hartford, CT (**Target Premises #1**), where both BAEZ and MOODY reside.

***September 8, 2025 - Undercover Purchase of Fentanyl from BAEZ at 22 Evergreen***

64. On September 8, 2025, ATF SAs (UC#1 & UC#2) acting in an undercover capacity were provided with pre-recorded ATF funds. In addition, UC#1 and UC#2 were equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF undercover vehicle (UCV). Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated a 20-gram fentanyl transaction with BAEZ.

65. UCs parked at a gas station at the corner of Evergreen Avenue and Farmington Avenue and proceeded on foot to 22 Evergreen Avenue. As the UCs reached the front entrance of 22 Evergreen, BAEZ was out front on the stoop, with two individuals. As BAEZ led the UCs into the interior of 22 Evergreen, it should be noted that BAEZ now had a key to access the interior of 22 Evergreen. BAEZ led the UCs to the same interior stairwell that was utilized on August 29, 2025 to conduct the suspected fentanyl transaction. UC#1 asked how much it cost for BAEZ to live at the new address and BAEZ indicated he was paying $1,250 for an apartment.

66. BAEZ indicated that he gave the UCs some "extra" on the suspected fentanyl, which investigators believed to mean that BAEZ provided more fentanyl than usual, but for the same price. UCs ended up purchasing approximately 22.5 grams of suspected fentanyl from BAEZ. UC#1 and BAEZ began discussing a previous meeting in which the sale of a firearm to the UCs fell through. BAEZ expressed frustration, indicating that he had provided HUTLEY $200.00 dollars up front with the expectation that HUTLEY would provide and sell firearms to the ATF UCs. BAEZ explained that he would rather deal with "it," which investigators believed BAEZ to mean firearms sales, with "CITY and them." Investigators believe that BAEZ trusted LEWIS, primarily, with the acquisition of firearms and was waiting on LEWIS to let BAEZ know when LEWIS and his associates had obtained any additional firearms for sale.

67. UC#1 indicated to BAEZ that he would soon be traveling to Vermont and BAEZ stated that he only needed three (3) days' notice to have something ready for the UCs to drop off and pick up. BAEZ explained that he would have four (4) "zips," common street vernacular for ounces, of "hard," which investigators know to be common street parlance for crack cocaine; and three (3) zips of "fent," which investigators know to be a reference to 3 ounces of fentanyl. BAEZ said in return, he was expecting sixteen (16) "bands," which investigators know to be common

street vernacular for thousands, with one band equaling $1,000.00. BAEZ stated that from the $16,000, the UCs would receive $2,000 for their role in delivering the drugs and returning the money. UCs purchased approximately 22.5 grams of suspected fentanyl from BAEZ for $1,300.00.

***September 23, 2025 – UC Purchase of Firearm & Fentanyl from BAEZ & HUTLEY***

68. On September 23, 2025, ATF SAs (UC#1 & UC#2), acting in an undercover capacity, were provided with pre-recorded ATF funds. In addition, UC#1 and UC#2 were equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF UCV. Prior to the transaction, UC#1 conducted recorded telephonic and SMS text message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated a 20-gram fentanyl transaction with BAEZ.

69. Upon arrival, ATF UCs were directed by BAEZ to come to the back of 22 Evergreen Avenue. Once the UCs parked and traversed the north side of 22 Evergreen, BAEZ yelled to the UCs from a window on the northeast corner of the building and met them on the 1st floor, leading them up a common access stairwell to HUTLEY, who was seated on the stairwell. HUTLEY greeted the UCs and immediately handed UC#1 a black pistol, later identified as a Taurus, model PT 809, 9mm caliber semi-automatic firearm, bearing serial number #TGS03436. HUTLEY informed the UCs that "it hold 19…" which investigators know through training and experience to mean that the firearm holds nineteen rounds of ammunition. HUTLEY then asked the UCs what they were looking for, referring to firearms the UCs were looking to acquire. UC#1 responded that Glocks and "ARPs" (AR-Pistols) were being sought. HUTLEY stated that he could get Glocks, "switches," a term known to investigators to indicate a firearm that has a machinegun conversion device (MCD) attached to it, and vests, which investigators believe HUTLEY to have referenced ballistic-style vests. It should also be noted that HUTLEY wore a disposable glove when handling

the firearm before transferring it to the ATF UCs, indicating his efforts to elude detection by law enforcement for fingerprints and DNA.

70. ATF UCs ended up paying HUTLEY $1,300.00 for the Taurus firearm. BAEZ also provided approximately 20.8 grams of suspected fentanyl to the ATF UCs for $1,400.00.



*HUTLEY providing ATF UCs a Taurus Pistol on September 23, 2025*

***<u>October 2, 2025 – UC Purchase of Firearms & Fentanyl from BAEZ & Others</u>***

71. On October 2, 2025, ATF SAs, acting in an undercover capacity (UC#1 & UC#2), were provided with pre-recorded ATF funds. In addition, UC#1 and UC#2 were equipped with audio/video recording and transmitting devices. For the duration of the operation, UC#1 and UC#2 utilized an ATF UCV. Prior to the transaction, UC#1 conducted recorded telephonic and SMS text

message communications with BAEZ, via **Target Telephone-1**. During these communications, UC#1 coordinated a 20-gram fentanyl transaction with BAEZ.

72. Upon arrival, UCs were met by BAEZ, LEWIS and an unidentified associate at the front of 22 Evergreen. BAEZ led the UCs to an interior stairwell and once inside, provided a clear plastic baggie containing an off-white powdery substance to UC#2 as LEWIS and UC#1 conversed. UC#2 weighed out the suspected fentanyl (later, ATF investigators would determine the suspected fentanyl to weigh approximately 21.1 grams) and proceeded to pay BAEZ $1,300.00 dollars in exchange.




*LEWIS and BAEZ talking to ATF UCs after a fentanyl purchase on October 2, 2025*

73. Soon after the purchase of fentanyl by UC#2, BAEZ led the UCs and LEWIS outside, to the north side of 22 Evergreen, at which point LEWIS walked away temporarily. BAEZ began speaking to UC#1, stating "it's a 9 with a 15 clip," which investigators know through training and experience to mean a 9mm caliber firearm with a 15-round magazine (capable of holding 15 rounds of ammunition). BAEZ wasn't sure on the price, and UC#1 indicated that if it wasn't too expensive, a deal could be reached. BAEZ stated, "it's my Puerto Rican boy…" and

added that the person who the UCs dealt with last time (HUTLEY) could not provide a firearm at that time.

74. BAEZ then asked UC#1 if he (UC#1) "bought AKs and shit like that…" which investigators know through training and experience to mean that BAEZ was inquiring if UC#1 purchased AK-47 style firearms. UC#1 responded with interest and that UC#1 needed to know so he could have the ability to conceal the firearm as well as have the appropriate funds to purchase the gun. BAEZ stated that he knew a couple people who had "them," meaning AK-47s. BAEZ stated that he had seen the AK and that the seller wanted $2,400.00 dollars. UC#1 offered to buy the AK-style firearm then and there, but BAEZ responded that the seller would need additional time and added that it would not come with any "food," common street parlance for ammunition.

75. LEWIS then reappeared and both he and BAEZ took out their phones. BAEZ can be heard dictating to LEWIS "860…655.." though if any other digits were provided, they were indiscernible. Investigators believe that BAEZ was providing contact information to LEWIS for the Puerto Rican individual related to firearms possession and trafficking. It should be noted that an analysis of **Target Telephone-1** and **Target Telephone-2** showed a combined total of nine (9) communications (three from **Target Telephone-1** and six from **Target Telephone-2**) to an 860-655-1759 on October 2, 2025. These communications occurred between 12:02 p.m. and 12:48 p.m., some of which time would have been when the ATF UCs were present with LEWIS and BAEZ at 22 Evergreen.

76. After receiving the number, LEWIS left again. BAEZ added that he intended on moving again soon, further down the street (Evergreen) and that he had bought a "benz," which investigators know to be common street slang for a Mercedes Benz vehicle. BAEZ elaborated that

it was a 2015 350e, that he got it at auction and it had about 86,000 miles on it. BAEZ said it ran smooth, that it had a sunroof and that he only used it to go to Probation.

77. BAEZ received a call from an unknown individual and asked where they were and that he was "trying to do this," which investigators believe was BAEZ emphasizing to the caller that he wanted to broker the gun deal between the caller and the UCs quickly. After the call ended, LEWIS returned and BAEZ explained that the caller lived roughly two minutes away, right up the street, but stated that they (unknown caller) needed their "40," common street parlance for .40 caliber firearm, to affect the firearm deal of another weapon with the UCs. BAEZ added that "I got so many people that got these shits, but when the time come, they give ya the straight run-around," which investigators took to mean that BAEZ knew a lot of people who possessed firearms and stated they were willing to sell them, but when BAEZ actually tried to line up a transaction, the sellers gave BAEZ excuses as to why they couldn't conduct a deal at that time.

78. UC#1 indicated imminent travel to Vermont and BAEZ asked where UC#1 was headed. UC#1 stated Burlington and BAEZ stated, "I could put something into play in Burlington." In reference to previous discussions between UC#1 and BAEZ, investigators believed BAEZ to be indicating that he could also set up a delivery of bulk drugs to the Burlington, VT area. BAEZ stated it would just be like a pickup, nothing crazy. BAEZ then stated, "that's where a lot of pipes coming from, VT," which investigators believed to be BAEZ displaying his knowledge that a lot of firearms travel from Vermont to Connecticut, illegally. BAEZ went on to say that there were too many "Cis" (confidential informants) out there (in Vermont), which investigators believed BAEZ to be saying that a lot of people in Vermont that were involved with illegal firearms and drugs were also assisting law enforcement. BAEZ stated that the reason he stopped going to Vermont was for that very reason.

79. BAEZ and the UCs then made their way inside the front vestibule of 22 Evergreen. An unknown associate of BAEZ's came in from Evergreen Avenue and asked BAEZ why "CITY" looked so frustrated. BAEZ responded, "because we're waiting on 'LOS', he's taking forever." Investigators believe that the individual referred to as "LOS" was supposed to be the source of the firearm(s) to be sold to the UCs. UC#1 suggested that perhaps "he" ("LOS") didn't have it and BAEZ responded that he had seen it on camera. UC#1 then suggested that they drive BAEZ or someone else to the gun supplier's residence to obtain the firearm if the supplier was uncomfortable coming to Evergreen Avenue.

80. Another unknown associate of BAEZ then appeared, a Black male with long dreadlocks, glasses and a hooded sweatshirt (UM-2). BAEZ and UM-2 start talking about another possible source of firearms, before UM-2 walked away. BAEZ then proceeded to tell the UCs that he "might just rob 'LOS,' might just take his shit." UM-2 then reappeared and BAEZ told UM-2 to "call him again," and UCs inferred that BAEZ was asking UM-2 to call HUTLEY, as UC#1 had asked about the seller from last time and BAEZ responded, "that's who we trying to call right now." UM-2 appeared to contact HUTLEY, but HUTLEY was unwilling or unable to come to complete a firearm transaction. BAEZ told UM-2 that HUTLEY still had a Taurus but wasn't sure what HUTLEY wanted for it, meaning how much money HUTLEY would be willing to sell the firearm to the UCs.



*BAEZ and UM-2 inside 22 Evergreen Avenue – October 2, 2025*

81. UCs then observed MOODY, wearing a black sweatshirt, jeans and red sneakers, appear in the vestibule on the phone. .




*Photo of MOODY on 10/2/25*

82. UCs heard UM-2 talking to someone on the phone and telling them to "come down the hallway quick." BAEZ and UM-2 went into the interior of 22 Evergreen. BAEZ then reappeared and stated that he'd have something in 40 minutes and while pointing back into the interior of 22 Evergreen said "he gonna go get it and come back, it'd be 40 minutes." UCs could not see the individual that BAEZ was referring to, but asked BAEZ what it was and BAEZ said it was a "Taurus 9…for $1,000" which investigators know through training and experience to be a

Taurus, 9mm caliber firearm that BAEZ was trying to broker for $1,000.00 dollars. BAEZ and LEWIS indicated that this firearm would be "guaranteed," meaning it was assuredly going to arrive and be sold. UCs stated they'd leave and come back when the firearm was present.




*UM-2, LEWIS and BAEZ at 22 Evergreen on October 2, 2025*

83. Shortly after the UCs departure, ATF surveillance units observed an unidentified Black male, wearing orange sneakers, dark-colored pants, dark-colored long sleeve shirt and an orange hat (UM-3) appear from the area of 22 Evergreen and cross the street, towards 21 Evergreen Avenue. Surveillance units then observed UM-3 reappear in the roadway and meet up with MOODY as well as an unidentified male wearing a white t-shirt and dark-colored pants. MOODY and the unidentified male then head towards 22 Evergreen as UM-3 walked towards and entered a black Honda sedan, briefly, before getting out and heading towards 22 Evergreen. A couple minutes later, UM-3 heads from the area of 22 Evergreen back to the black Honda sedan, getting in the driver's seat and pulling away, heading south on Evergreen Avenue. It should be noted that surveillance did not observe anyone else leaving the area of 22 Evergreen and getting into a vehicle that departed the area around this time, nor in conjunction with the UCs departure from the area. Surveillance units were able to maintain visual contact with the target vehicle (the black Honda) and noted its license plate as CT BU-08305. A query of the CT Department of Motor Vehicles (CT

DMV) revealed that BU-08305 was registered to an Iren WILLIAMS (WILLIAMS) and provided vehicle details of a black 2008 Honda Accord Ex-1. The registered address was 27 High Street, Apt. A, Vernon, CT (**Target Premises #3**).

84. Surveillance units maintained visual contact with the Honda Accord until it arrived at 27 High Street, Vernon, CT at approximately 1:44 p.m. At approximately 1:46 p.m., As surveillance units drove by the residence, they observed UM-3, still wearing the same clothing (orange hat, orange sneakers, etc.) standing on the porch, in front of "Apt. A" at 27 High Street (**Target Premises #3**), speaking to an unknown older male, who was seated on the porch just to the left of the door labeled "Apt. A." Surveillance units noted that UM-3 had a bag in his hand, possibly with some green on it. Due to the one-way directive of High Street, by the time additional surveillance units were able to arrive or pass by the address again, UM-3 and the black Honda Accord were no longer visible at 27 High Street. Surveillance units immediately started heading back towards 22 Evergreen Avenue.

85. At approximately 2:15 p.m., surveillance units that had remained at 22 Evergreen observed the Honda Accord arrive on Evergreen Avenue traveling from south to north and turning around on Farmington Avenue to park facing south on Evergreen. A search of historical directional data from two different providers for October 2, 2025, with a start location of 27 High Street, Vernon, CT and an arrival location of 22 Evergreen Avenue, Hartford, CT, and an arrival time of approximately 2:15 p.m. provided an approximate travel time of 22-30 minutes, dependent upon traffic, etc. Considering surveillance lost UM-3 and the Honda Accord around approximately 1:46 p.m. and then reacquired the Honda Accord at approximately 2:15 p.m. on Evergreen Avenue, it took the Honda Accord approximately 29 minutes to get back to 22 Evergreen. Moreover, surveillance units that followed the Honda Accord to 27 High St., Vernon started heading for

Evergreen Avenue as soon as they realized the vehicle had left 27 High Street but reported no visual contact with the Honda Accord and added that there was traffic on I-84, heading westbound. Those surveillance units reported that when they were on I-84 west, right before exit 48 (Asylum Avenue, Hartford, CT), the units already at Evergreen Avenue reported the Honda Accord's return. The surveillance units that had followed UM-3 to Vernon, CT were two exits prior to Sisson Avenue, the fastest exit to take to get to Evergreen Avenue, and the Honda Accord was already back on Evergreen Avenue. In other words, according to the historical data available, as well as investigators' own observations, affiant does not believe UM-3 had the time to make a significant stop anywhere else to acquire firearms, or anything else, and still return to 22 Evergreen at the time that he did, after he left from 27 High Street, Vernon, CT that day.

86. After the Honda Accord came to a stop at the corner of Farmington Avenue and Evergreen Avenue, it reparked along the same side of the street (west), but across the street from 22 Evergreen. It is affiant's belief that UM-3 reparked the Black Honda because he was transporting firearms, and parking closer to 22 Evergreen gave him less exposure walking from the Honda to 22 Evergreen than walking from the corner of Evergreen/Farmington Avenue. Surveillance units then observed UM-3 exit the Honda Accord, this time holding a large multi-colored bag. UM-3 clutched the bag under his left arm and headed towards and into 22 Evergreen. In addition, the surveillance unit that observed UM-3 standing on the porch of 27 High Street, Apt. A, Vernon, CT (**Target Premises #3**), holding the bag, was able to review a still-shot photograph taken when UM-3 returned to 22 Evergreen and carried the bag towards 22 Evergreen. The surveillance unit stated that the bag UM-3 carried towards 22 Evergreen bore a strong resemblance to the bag he observed UM-3 holding at 27 High Street.



*UM-3 carrying a bag towards 22 Evergreen on October 2, 2025*

87. At approximately 2:18 p.m. the UCs started traveling back to 22 Evergreen Avenue. At approximately 2:23 p.m., UC#1 received a text message from BAEZ on **Target Telephone-1** that read "Got 3." Investigators believe from training and experience, that BAEZ was telling UC#1 that he had 3 firearms and was ready to sell them to the UCs.

88. At approximately 2:26, the UCs returned to 22 Evergreen and informed BAEZ they were in the building. UCs were let into the interior of 22 Evergreen by an unwitting citizen and as they traversed the 1st floor from west to east, UM-2 was standing at the far east side of the building, down the hall. BAEZ led the UCs down a common-access stairwell located in the northeast corner of the building. As the UCs and BAEZ traversed the stairs, BAEZ handed UC#1 a blue and red bag which contained a firearm, and BAEZ was holding two additional firearms in his hands. The firearms were later identified as a Glock, model 17Gen5, 9mm caliber pistol, bearing serial number #BTNB646, an HS Product, model XD-9, 9mm caliber pistol, bearing serial number #XD949937 and a Taurus, model G3C, 9mm caliber pistol, bearing serial number #ACH171723. BAEZ joked that he came through for the UCs this time, which investigators believe BAEZ to be stating that he was able to procure firearms to sell to the UCs. BAEZ stated the Glock was $1,500.00, the HS was $1,400.00 and the Taurus he would sell to the UCs for $900.00.




*BAEZ holding two handguns at 22 Evergreen on October 2, 2025*

89. As the UCs, BAEZ and UM-2 were discussing the firearms and prices, UM-2 (speaking about the Glock) stated that "you could do some shit to em, make it automatic…" Investigators believed through training and experience that UM-2 was displaying knowledge that putting a machinegun conversion device (MCD), a.k.a. a "switch" into the slide of a Glock firearm could turn it from semi-automatic to automatic fire. UM-2 added that the 3D-printed stuff breaks because it overheats. UM-2 elaborated that the 3D-printed guns are good for maybe 2 times, but not the long run, they will jam and break. UCs ended up paying $3,800.00 dollars for all 3 firearms and then departed 22 Evergreen Avenue.

90. A query of WILLIAMS through the CT DMV provides his address as 27 High Street, Apt. A, Vernon, CT (**Target Premises #3**), as do three (3) separate open source databases.

91. Furthermore, a toll analysis from **Target Telephone-1**, data being provided via DEA administrative subpoena, revealed that **Target Telephone-1** was in contact with telephone number 860-833-0082 on three (3) occasions from August 8, 2025 to August 16, 2025. Open source queries of that number showed that the number 860-833-0082 is associated with an Iren WILLIAMS. Further analysis of **Target Telephone-1** showed that from June 7, 2025 to October

3, 2025, **Target Telephone-1** has had contact with 860-833-0082 approximately 78 times. A query of 860-833-0082 in CashApp revealed a profile with a display name of "I Winnz," and a Cashtag of "$willyhndrxx860". The profile also provided a photo, seen below and next to a CT DMV photo of WILLIAMS.



***Identification of Javon HUTLEY***

92. On August 4, 2025, ATF received the results of a request sent to the Groton Police Department (GPD). ATF had sent an unidentified photograph of HUTLEY's face from the July 28, 2025 interaction to GPD, which they then uploaded to a web-based platform tool with advanced forensic facial recognition capabilities. The technology utilizes over 50 billion photographs obtained from open sources to produce facial matches using complex algorithms. One of the photos sent from GPD's query is set forth below.

93. Further, a query through the CT Department of Motor Vehicles of "Javon Hutley," produced the below-depicted image. From the multiple photographs gathered from separate sources, ATF investigators are confident that the individual who sold ATF UC's a Ruger pistol on July 28, 2025, and a Taurus pistol on September 23, 2025, was, in fact, Javon HUTLEY. Several photographs of Hutley are set forth below:

| | |
|---|---|
|  |   |
| *Photo of HUTLEY from CT DMV* | *Photo of HUTLEY from Groton PD* |

| | |
|---|---|
|  |  |
| *HUTLEY in Possession of a Ruger Pistol on 07/28/2025* | *HUTLEY providing ATF UCs with a Taurus Pistol on 9/23/25* |

***Surveillance and ID of Target Telelphone-2 – September 26, 2025***

94. On June 11, 2025, ATF investigators received the results of a query sent to the Drug Enforcement Administration (DEA) for tolls of **Target Telephone-1**. The DEA administrative subpoena sent to T-Mobile provided tolls for **Target Telephone-1** from May 10, 2025 to June 9, 2025. According to the tolls, BAEZ contacted telephone number **860-993-8586** (**Target Telephone-2**) four (4) times between May 25, 2025 and June 8, 2025. ATF investigators conducted several open source queries of the **Target Telephone-2**, several of which returned to a possible user of Corey Lewis

95. On September 26, 2025, ATF investigators conducted surveillance at 22 Evergreen Avenue, Hartford, CT. At approximately 5:17 p.m., investigators observed a Black male wearing gray sweatpants, a gray sweatshirt with red lettering and a purple ball cap, standing outside of 22 Evergreen. After additional observation, ATF believed this male to be LEWIS. While continuing to observe LEWIS, ATF investigators dialed the **Target Telephone-2** number at approximately 5:18 p.m. While the call was being put through, surveillance observed LEWIS reach into his pants pocket and pull out a cellphone. Further, LEWIS was then observed looking at the cellphone before placing it to his right ear. At this same time on the phone that was used to dial LEWIS over the **Target Telephone-2**, investigators heard a male voice say "hello?" Investigators then ended the call on their end and observed LEWIS take the phone away from his ear and look at the cellphone again.



*LEWIS looking at and answering **Target Telephone-2** on September 26, 2025*

96. A few minutes later, LEWIS is observed looking at the **Target Telephone-2** again before proceeding to call the ATF phone back (which went unanswered by investigators). The number that showed up on the ATF phone was "860-993-8586" (the **Target Telephone-2**). Furthermore, surveillance units observed that LEWIS was wearing the same hat that he had worn on July 28, 2025, the day on which he sold ATF UCs the rifle for $700.00 dollars. The hat is further described as a purple baseball style hat with "777" written above the brim in the front with white lettering.

97. A toll analysis between **Target Telephone-2** (LEWIS) and **Target Telephone-1** (BAEZ) revealed that between June 7, 2025 and October 8, 2025, there are approximately fourteen (14) communications between **Target Telephone-2** and **Target Telephone-1**, with the latest being four (4) communications on October 7, 2025. Many of these communications occur days before ATF UCs would conduct purchases of fentanyl and/or firearms from BAEZ. For instance, there are two communications between **Target Telephone-2** and **Target Telephone-1** on September 21, 2025. ATF UCs conducted a fentanyl purchase from BAEZ and a firearm purchase from HUTLEY

on September 23, 2025. Affiant believes that the communications between BAEZ (**Target Telephone-1**) and LEWIS (**Target Telephone-2**) in the days leading up to September 23, 2025, were BAEZ attempting to acquire additional fentanyl and/or firearms from LEWIS. In furtherance of that theory, BAEZ, utilizing **Target Telephone-1**, texted UC#1 on September 21, 2025, stating, "Might have that line up for u tm with city." Affiant believes BAEZ was telling UC#1 that he (BAEZ) might have a firearm from LEWIS a.k.a. "CITY" when UC#1 visited BAEZ the following day. UC#1 responded with interest but informed BAEZ that UC#1 was planning to meet with BAEZ on September 23, 2025.



*LEWIS wearing a purple hat with white "777" on September 26, 2025*

***CashApp Query – Target Telephone-2 – September 28, 2025***

98. On September 28, 2025, ATF investigators queried the **Target Telephone-2** in Block Inc., application CashApp. The profile name associated with the **Target Telephone-2** was "Cory Lewis," and the Cash Tag associated with the **Target Telephone-2** was "$Rarebred18." ATF investigators believe that LEWIS is the actual user of this CashApp account

***Identification of Target Telephone-3 & HUTLEY's residence***

99. On September 19, 2025, ATF investigators located a Facebook page with the display name of "Jrock Rip TyTy Hutman." The profile picture associated with this Facebook page was of a business card for "J&E Pull Up Boyz," further described as a mobile mechanic fast service. The contact information provided on the card included "JAVON – **860.883.6899**," an email address of hutley22@gmail.com and another contact name of "EDWIN – 860.XXX.XXXX[2] Moreover, the uniform resource locator (URL) for the Facebook page is: https://www.facebook.com/JavonRiptytyHutley. Finally, a quick search through the available photos on the Facebook page produced the following image:



*Photo of HUTLEY from social media*

[2] Full number known to the affiant.

100. Based on the URL of the actual Facebook page, the use of the name "Javon" next to **Target Telephone-3**, the email address with "hutley" in it and the picture clearly resembling HUTLEY, investigators believe this account to be controlled and utilized by HUTLEY. There are postings on this Facebook page as recently as October 4, 2025.

101. On October 3, 2025, an ATF Agent, acting in an undercover capacity (UC#3), called **Target Telephone-3**. UC#3 dialed **Target Telephone-3** and a male voice answered. UC#3 employed a ruse that their vehicle had damage, was in need of repair and wanted to know if it could be fixed. The user of **Target Telephone-3** stated that he needed the year, make and model of the vehicle and requested pictures be sent. The user of **Target Telephone-3** stated that after that, he could get back to UC#3 in about a half hour about what he could do, he first just needed to see what was going on with the vehicle. UC#3 asked if this was a good number to reach the caller at, to which the user responded "yes….yes." UC#3 then asked for clarification on the user of **Target Telephone-3**'s name. UC#3 asked for pronunciation, was it "jah-von" or "jay-von," to which the user of **Target Telephone-3** answered "jay-von." Based on the above conversation between UC#3 and **Target Telephone-3**, investigators believe the user of **Target Telephone-3** to be Javon HUTLEY.

102. A toll analysis of **Target Telephone-3** revealed that there were two communications between **Target Telephone-3** and **Target Telephone-1** (BAEZ) on June 29, 2025. Additionally, since October 7, 2025, at which time Magistrate Judge Robert A. Richardson authorized a pen register and a search warrant for prospective location information for **Target Telephone-3**, HUTLEY has had approximately thirty-two (32) communications.

103. Further, prospective location information for **Target Telephone-3** has been helpful in identifying HUTLEY's suspected residence. Numerous locations alerts sent from the service

provider (T-Mobile), as recently as approximately 9:12 p.m. on October 8, 2025, place **Target Telephone-3** within a very short distance, if not inside, of 221 Sisson Avenue, Hartford, CT, which is a multi-unit building. This location is within walking distance of 22 Evergreen Avenue, Hartford, CT. On September 23, 2025, ATF UCs purchased a firearm from HUTLEY at 22 Evergreen Avenue. After the exchange, surveillance units were able to observe HUTLEY walking south on Evergreen, then head east on Fales Street and finally south on Sisson Avenue, at which point surveillance lost sight of HUTLEY. 221 Sisson Avenue is located very close to the intersection of Fales Street and Sisson Avenue. Affiant believes that surveillance units lost HUTLEY because after turning south on Sisson Avenue, HUTLEY was able to quickly reach his residence, located at 221 Sisson Avenue.



*HUTLEY on September 23, 2025, at the Corner of Evergreen Ave / Fales Street*

***<u>MOODY's phone & residence - 22 Evergreen Ave, Apt. B7, Hartford, CT</u>***

104. On September 1, 2025, ATF received the results of a request sent to the Groton Police Department (GPD). ATF had sent an unidentified photograph of MOODY's face from both

the August 19, 2025, and the August 29, 2025, meetings to GPD, in which MOODY was present while ATF UCs purchased fentanyl from BAEZ. GPD then uploaded the images to the same web-based platform tool with advanced forensic facial recognition capabilities. One of the photos received from the GPD query, which is depicted below, was sent with the title "Roger Moody's social accounts…"

105. Three separate open source queries place MOODY at 22 Evergreen Avenue, Apt. B7, Hartford, CT (**Target Premises #1**). So too, does his CT DMV return, which also returned the following photograph tied to MOODY's CT DMV information. Several relevant photos of MOODY are set forth below:

| | |
|---|---|
|  |  |
| *Photo of MOODY from Groton PD query* | *CT DMV photo of MOODY* |

| | |
|---|---|
|  |  |
| *Photo of MOODY during fentanyl sale on 8/19/25* | *Photo of MOODY at 22 Evergreen on 8/29/25* |

106. Furthermore, during the ATF UC fentanyl transaction on August 29, 2025, MOODY had to use a key on his person to admit BAEZ and the UCs into the interior of 22 Evergreen. Additionally, a subpoena for utilities information for 22 Evergreen Avenue, the results of which were received on September 17, 2025, lists "Roger D. Moody" as the customer's name attached to 22 Evergreen Avenue, Apt. B7, Hartford, CT (**Target Premises #1**).

107. An analysis of tolls for **Target Telephone-1** revealed that on August 7, 2025 (a date when BAEZ sold fentanyl to the UCs), BAEZ had contact with telephone number 860-984-0942 (**Target Telephone-4**) three (3) times. A query of this number in three open source databases reveal that 860-984-0942 (**Target Telephone-4**) is associated with MOODY at 22 Evergreen Avenue, Apartment B7, Hartford, CT (**Target Premises #1**). Additionally, a query of telephone number (860-984-0942 - **Target Telephone-4**) through Eversource also produces an address of 22 Evergreen Avenue, Apt. B7, Hartford, CT (**Target Premises #1**).

108. Finally, from July 11, 2025 to October 8, 2025, telephone number 860-984-0942 (**Target Telephone-4**) has had a total of twenty-two (22) contacts with other **Target Telephones** in this investigation as follows: (1) **Target Telephone-1** (BAEZ) has had fifteen (15) communications with **Target Telephone-4** (MOODY) between August 6, 2025, and October 8, 2025; (2) **Target Telephone-2** (LEWIS) has had one contact with **Target Telephone-4** (MOODY) on July 11, 2025; and (3) **Target Telephone-3** (HUTLEY) has had six (6) communications with **Target Telephone-4** (MOODY) between September 6, 2025, and September 14, 2025

109. During physical surveillance, as recently as October 2, 2025, investigators have observed MOODY at and/or in the vicinity of 22 Evergreen Avenue. Further, information obtained as part of the ongoing investigation has identified that MOODY maintained account XXXXXXX51[3] at JPMorgan Chase Bank, N.A., titled to ROGER DEWITT MOODY, opened on July 17, 2024. The address on the account was 22 Evergreen Ave, B-7, Hartford, CT 06105 (**Target Premises #1**). On or about August 30, 2024, a check in the amount of $42,921.60 was deposited to account XXXXXXX51 via ATM. The payee on the check was listed as "Roger Moody 22 Evergreen Ave Hartford, CT 06105". JPMorgan Chase Bank, N.A. confirmed that the check was counterfeit by the maker. The account was subsequently closed as a result of this activity.

110. Based on BAEZ's statements to the UCs, precise location data for **Target Telephones**, physical surveillance and other information developed during this investigation, investigators believe that BAEZ and MOODY reside at 22 Evergreen Ave., Apt. B7, Hartford, CT (**Target Premises #1**).

***Subscriber Information – Target Telephones – BAEZ, LEWIS and HUTLEY***

111. On August 7, 2025, ATF received subscriber and toll information for the **Target**

[3] The full number is known to the affiant.

**Telephone-1** from the DEA. The subscriber information for **Target Telephone-1** revealed that both the customer and subscriber name were "Antonio Baez."

112. On August 7, 2025, ATF received subscriber and toll information for the **Target Telephone-2** from the DEA. The subscriber information for the **Target Telephone-2** revealed that both the customer and subscriber name were "Cory Lewis."

113. On October 7, 2025, ATF received subscriber and toll information for **Target Telephone-3** from the DEA. The subscriber information for **Target-Telephone-3** revealed that both the customer and subscriber name were L.R.[4] at an address in Hartford, CT.

***Pen Register and Ping Warrant - BAEZ, LEWIS & HUTLEY***

114. On September 15, 2025, United States Magistrate Judge Thomas O. Farrish authorized a search warrant for prospective location information and an order for pen register and trap and trace information regarding **Target Telephone-1**. On October 6, 2025, United States Magistrate Judge Robert A. Richardson authorized an additional search warrant for prospective location information and an order for pen register and trap and trace information regarding **Target Telephone-1**.

115. The data that has been received in response to the court authorizations for **Target Telephone-1** corroborated information discovered by ATF regarding BAEZ. For instance, agents believed that BAEZ resided at 22 Evergreen Avenue, Hartford, CT based on his own admissions as well as his interactions with ATF Undercover Agents. The location data provided thus far for **Target Telepohone-1** indicates that BAEZ likely does reside within 22 Evergreen Avenue.

116. On September 25, 2025, Magistrate Judge Thomas O. Farrish authorized a warrant for a pen register, trap and trace and location data for another number previously associated with

[4] Full name known to the affiant.

HUTLEY. In response to serving the warrant and order associated with Judge Farrish's authorization, AT&T informed ATF that the account associated with HUTLEY's number had been suspended since May 2025 and there was no activity or data to provide.

117. On September 30, 2025, Magistrate Judge Farrish authorized a search warrant for prospective location information and an order for pen register and trap and trace information regarding **Target Telephone-2.** The location data has been indispensable in assisting investigators in locating LEWIS' residence. As discussed herein, location information for **Target Telephone-2** has shown that LEWIS is spending most nights at or within a very close proximity to 487 New Britain Avenue, Hartford, CT (the location of **Target Premises #2**).

118. On October 7, 2025, Magistrate Judge Robert A. Richardson authorized a warrant for location data and an order for a pen register regarding **Target Telephone-3**.

***Identification of LEWIS's Address – 487 New Britain Ave, Apt. B7, Hartford, CT***

119. On August 22, 2025, ATF received administrative subpoena return information for **Target Telephone-2**. As part of the data received, **Target Telephone-2** was in contact with telephone number 774-362-2955 approximately 83 times between August 6, 2025 and August 21, 2025. Open source queries of the 774-362-2955 number revealed it was associated with "Cory Lewis," and "Ashley McKenley." A likely address associated with 774-362-2955 in multiple open source queries was 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**). A query of the same 774-362-2955 number through Eversource revealed that it was associated with 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**). Based on evidence developed during this investigation, investigators believe that LEWIS resides with Ashley McKenley at 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**) and that McKenley currently is using 774-362-2955.

120. On September 10, 2025, the Hartford Police Department arrested LEWIS and charged him with Criminal Mischief 2nd, Breach of Peace 2nd, Threatening 2-Physical Threat, and Criminal Trespass 1st. During LEWIS's September 10, 2025 arrest, he provided 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**) to the arresting officers as his current address.

121. Additionally, location data for **Target Telephone-2**, which is being received as recently as October 6, 2025, indicates that LEWIS is spending most nights at or within a very close proximity to 487 New Britain Avenue, Hartford, CT, consistent with LEWIS residing at **Target Premises #2**. For example, **Target Telephone-2** continually pings near a location on Hillside Avenue in Hartford, CT, with T-Mobile providing an approximate uncertainty radius of 330 meters. Below is an overhead image of 487 New Britain Avenue in relation to where **Target Telephone-2** is pinging. On October 6, 2025, **Target Telephone-2** was pinging at this location from approximately 12:02 a.m. to 10:22 a.m.



122. On October 3, 2025, ATF investigators traveled to 487 New Britain Avenue and entered the front vestibule where tenants' mailboxes are located. On the mailbox to Apartment B7 at 487 New Britain Ave. (**Target Premises #2**), the tenants "A. McKenley" and "C. LEWIS" were written on a piece of paper and adhered to the mailbox.




*Mailbox for 487 New Britain Ave., Apt. B7, Hartford, CT – October 3, 2025*

***DNA Swabs & CODIS Hit – Javon HUTLEY***

123. Investigators have swabbed evidence in this investigation for potential touch DNA. On July 29, 2025, ATF investigators swabbed the Ruger pistol for potential touch DNA and submitted the swabs to the Connecticut State Forensic Laboratory, located in Meriden, CT, on July 31, 2025.

124. On October 3, 2025, ATF investigators received notification from the CT State Forensic Laboratory that based on the DNA samples submitted from the Ruger pistol purchased on July 28, 2025, a Combined DNA Index System (CODIS) hit had been generated. The offender's name associated with the CODIS hit was Javon HUTLEY.

***Criminal History – BAEZ, LEWIS, HUTLEY & MOODY***

125. A query of BAEZ in the State of Connecticut Judicial Branch revealed that he has

four (4) pending matters in the State of Connecticut. Arrests, all of which were conducted by the Hartford Police Department, range from April 30, 2024 to July 25, 2025 and include charges of Sale of Narcotics, Possession of a Controlled Substance, Possession with Intent to Sell a Controlled Substance, Disorderly Conduct, Violation of Conditions of Release, Home Invasion, Robbery 1, Assault 3, Threatening 1st, and conspiracy to commit Home Invasion, Robbery and Assault. All cases are either awaiting plea or disposition.

126. BAEZ does not possess a valid Connecticut Pistol Permit. Furthermore, BAEZ is currently on CT State Probation with a GPS monitored bracelet and has an active Protective Order placed against him, both of which prohibit BAEZ from possessing or purchasing a firearm.

127. LEWIS is a previously convicted felon, having been sentenced to felony time for Robbery 2nd, Criminal Possession of a Weapon, Possession with Intent to Distribute and Assault of Public Safety Personnel, all of which occurred in Connecticut. LEWIS has also been arrested for Reckless driving, Assault 3rd, and Probation Violations. LEWIS' most recent arrest occurred in Hartford, CT on September 10, 2025, during which he was arrested for Criminal Mischief 2nd, Breach of Peace 2nd, Threatening 2-Physical Threat, and Criminal Trespass 1st. LEWIS was subsequently released from custody. LEWIS does not possess a valid Connecticut Pistol Permit.

128. HUTLEY is a previously convicted felon, having been sentenced to five (5) years jail, 18 months suspended and 3 years' probation for Carrying a Pistol without a Permit. HUTLEY was arrested by the Hartford Police Department for this crime and was sentenced on or about May 5, 2022. HUTLEY also has arrests for Larceny of a Motor Vehicle, Possession of a Controlled Substance, Interfering/Resisting, Assault 3, Probation Violation, and Violation of Conditions. All of these offenses occurred in Connecticut. Furthermore, HUTLEY is currently on CT State Probation and has an active Violation of Probation Warrant, as well as a rearrest ordered, both of

which prohibit HUTLEY from possessing or purchasing a firearm. HUTLEY also does not have a valid pistol permit in the State of Connecticut.

129. MOODY is a previously convicted felon, having been sentenced to five (5) years jail, 60 days suspended, 3 years' probation and 25 days of community service arising from a Robbery 3rd arrest in Hartford in 2008. MOODY also has a previous felony conviction for Forgery 2 (West Hartford, CT), as well as arrests for Larceny 6 (three separate arrests), Failure to Appear 2 and Larceny 5th, the most recent arrest being on August 20, 2023. All of these events occurred in Connecticut.

***CT State Laboratory – Drug Analysis***

130. On June 27, 2025 and August 27, 2025, respectively, ATF received Lab Reports from the CT State Forensic Laboratory located in Meriden, CT. The results indicate that the purchases made from BAEZ and others on June 5, 2025, June 16, 2025, June 24, 2025, July 3, 2025, July 9, 2025, July 22, 2025, July 28, 2025 and August 19, 2025 all contained the presence of fentanyl. Based on the lab reports received thus far, additional substances found within the fentanyl sold by BAEZ to the ATF UCs during these controlled purchases include the following: xylazine, o-methylfentanyl, acetyl fentanyl, carfentanil, para-fluorofentanyl, medetomidine, and BTMPS. ATF investigators are still awaiting lab results from the other purchases made from BAEZ and others.

***Undercover Purchased Firearms that were Reported Stolen***

131. All the firearms purchased thus far in the investigation have been queried through the National Crime Information Center (NCIC) to see if any had been reported stolen. Of the seven (7) firearms purchased to date from BAEZ, LEWIS, HUTLEY and other involved parties, four (4) of them have been reported stolen. The stolen firearms include the following:

a. The Mossberg, Patriot model rifle purchased from LEWIS on July 28, 2025, was reported **stolen** out of Suffield, CT in March of 2025 and was part of multiple additional firearms that were stolen during the same incident.

b. The Taurus, model PT809 pistol purchased from HUTLEY on September 23, 2025, was reported **stolen** out of Tuscaloosa, Alabama.

c. Both the Glock, model 17GEN5 and the HS Product, model XD-9, which were sold to the UCs by BAEZ on October 2, 2025, had been reported stolen, the Glock **stolen** out of Hartford, CT and the HS Product **stolen** out of West Hartford, CT.

***National Integrated Ballistic Information Network (NIBIN) Preliminary Results***

132. On July 18, 2025, ATF received preliminary results from the National Integrated Ballistic Information Network (NIBIN) which revealed that the Ruger P89 that was in the possession of BAEZ before being sold to ATF UCs on July 9, 2025, was a match to the shell casings recovered at an incident in Hartford, CT on January 18, 2025. The incident involved the discharge of a firearm at least nine (9) times, though no suspect, witness or victim was located. No additional NIBIN leads have been generated on any other firearm purchased from BAEZ, HUTLEY, LEWIS or other co-conspirators.

***Interstate Nexus***

133. On July 28, 2025, an ATF Interstate Nexus Expert investigated the Ruger P89 seized in this case and determined that both the Ruger and the eight (8) rounds of ammunition seized with it, which were sold to the ATF UCs on July 9, 2025 by BAEZ, who was with LEWIS, were both shipped or transported in interstate or foreign commerce.

134. On October 9, 2025, an ATF Interstate Nexus Expert stated that a preliminary investigation of the Ruger, model EC9s, 9mm caliber pistol purchased from HUTLEY on July 28, 2025; the Mossberg, model Patriot, .30-06 caliber rifle purchase from LEWIS on the same date; the Taurus, model PT 809, 9mm caliber pistol purchased from HUTLEY on September 23, 2025; and the Glock, model 17GEN5, 9mm caliber pistol, HS Product, model XD-9, 9mm caliber pistol

and Taurus, model G3C, 9mm caliber pistol purchased from BAEZ on October 2, 2025, had all affected interstate or foreign commerce.

***Summary of Evidence***

135. BAEZ, LEWIS, HUTLEY and MOODY have trafficked, coordinated, brokered, conspired, possessed and/or sold ATF Undercover Agents seven (7) firearms, four of which were stolen, and hundreds of grams of fentanyl (mixed with other controlled substances). BAEZ and HUTLEY did so while being on active probation—BAEZ with an active protective order and multiple state cases pending. Investigators determined that one of the firearms sold through BAEZ may be linked to a shots-fired incident in Hartford and that four (4) separate firearms sold to the ATF UC's have been reported stolen from Connecticut to Alabama.

136. Based on information developed during this investigation, there is probable cause to believe that BAEZ, LEWIS, HUTLEY and MOODY have committed the specified Target Offenses.

137. In addition, based on information developed during this investigation, there is probable cause to believe that MOODY and BAEZ reside at 22 Evergreen Ave., Apt. B7, Hartford, CT (**Target Premises #1**); that LEWIS resides at 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**); and the targets use their residences to facilitate their illegal activities. As discussed herein, on four occasions between August 29, 2025 and October 2, 2025, BAEZ and his associates (which included MOODY) sold fentanyl and/or firearms to the UCs at 22 Evergreen Ave, Hartford, CT (the location of **Target Premises #1**). As also discussed herein, during the June 16, 2025 controlled transaction, BAEZ, in substance, requested UC#1 to drive UM-1 over to LEWIS's residence located at 487 New Britain Avenue, Apt. B7, Hartford, CT (**Target Premises #2**) to procure more fentanyl. As further discussed herein, there is probable cause to believe that

**Target Premises #1** (MOODY's and BAEZ's residence) and **Target Premises #2** (LEWIS's residence) will contain substantial evidence of the Target Offenses, including, among other things, the following: evidence of cooking, mixing, processing, preparing, packaging and/or storing drugs; evidence of disassembling, modifying, possessing and/or storing firearms; proceeds of their illegal firearms and narcotics trafficking activities; money needed to maintain and finance their illegal firearms and narcotics trafficking activities; narcotics; cutting agents and diluents; narcotics processing materials; scales; wax folds, rubber bands, plastic baggies and other narcotics cutting materials; names, addresses and/or telephone numbers of suppliers, clients and associates involved in illegal firearms and narcotics trafficking activities; photographs, videos and/or documents revealing the identities of co-conspirators and associates involved in the criminal activities; firearms, ammunition and/or other weapons that are used to conduct the illegal firearms activities and to protect and secure illegal drug trafficking activities; and cell phones used to facilitate their illegal activities, including **Target Telephone-1** and **Target Telephone-4** (at **Target Premises #1**) and **Target Telephone-2** (at **Target Premises #2**).

138. In addition, there is probable cause to believe that on October 2, 2025, a co-conspirator traveled to 27 High Street, Apt. A, Vernon, CT (**Target Premises #3**) to obtain a firearm that BAEZ sold to the UCs. There is probable cause to believe that **Target Premises #3** will contain fruits, evidence and/or instrumentalities of their illegal firearms activities, including, among other things, the following: firearms, ammunition and firearm accessories; evidence of disassembling, modifying, possessing and/or storing firearms; proceeds of their illegal firearms activities; money needed to maintain and finance their illegal firearms activities; names, addresses and/or telephone numbers of suppliers, clients and associates involved in illegal firearms activities; photographs, videos and/or documents revealing the identities of co-conspirators and associates

involved in the criminal activities, the firearms and ammunition involved in their illegal activities, and the locations where they conduct their illegal activities; firearms, ammunition and/or other weapons that are used to conduct the illegal firearms activities; cell phones used to facilitate their illegal activities; and evidence of the possession, use, ownership and/or control over **Target Premises #3**.

139. In addition, there is probable cause to believe that BAEZ, LEWIS, HUTLEY and MOODY use **Target Telephone-1, Target Telephone-2, Target Telephone-3** and **Target Telephone-4**, respectively; that they use the **Target Telephones** to facilitate their criminal activities; and that evidence, fruits and/or instrumentalities of the Target Offenses will be found on the **Target Telephones**. There is probable cause to believe that the **Target Telephones** will contain, among other evidence, the following: communications between the targets and their sources of supply, their customers, and their other associates involved in illegal firearms and narcotics trafficking activities; location data regarding the location of BAEZ, LEWIS, HUTLEY and MOODY when they are conducting illegal firearms and/or narcotics trafficking activities, including locations where they disassemble, assemble, modify, possess, use, store, sell and/or transfer firearms and ammunition, and locations where they process, package, store and conduct narcotics transactions; evidence regarding phone-related features and applications, such as messenger and text messaging, used to contact and communicate with associates involved in their illegal activities; stored phone numbers of their customers, associates or their sources of firearms and/or illegal narcotics within the electronic memory of their phones, including in contact lists, address lists, recent call lists and electronic calendars; and photographs, slides, or video movies of firearms, drugs, their co-conspirators, contraband, proceeds from the sale of narcotics and/or firearms, and assets purchased with illegal proceeds.

140. Furthermore, there is probable cause to believe that BAEZ, LEWIS, HUTLEY and MOODY carry on their person and/or have on their person evidence, fruits and/or instrumentalities of the Target Offenses, including, among other things, firearms, ammunition, narcotics, proceeds from the sale of narcotics and illegal firearms activities, and the **Target Telephones**. In addition, there is probable cause to believe that the collection of a DNA sample from each of these targets will yield fruits, instrumentalities and evidence of the Target Offenses.

**Training and Experience**

141. Based on my training, personal experience, participation in criminal investigations, and the collective experience of other law enforcement officers that I work with, I have become familiar with the methods and techniques used by individuals engaged in the illegal possession, use, sale, transfer and/or distribution of firearms and narcotics. I know that those engaged in criminal conduct, such as illegal firearms and the possession and distribution of narcotics, will often utilize their residence, phone(s) and vehicle(s) to facilitate such crimes. Criminals utilize their residence to sell from as well as store illegal drugs and guns. Residences are often used for cooking, mixing, processing, preparing, packaging and/or storing drugs, and for assembling, disassembling, modifying and storing firearms. In addition, residences often contain substantial evidence of a criminal's illegal firearms and narcotics trafficking activities. Based on my training, experience, and participation in this and other narcotics investigations, I know that persons involved in illegal firearms activities and/or illegal narcotics trafficking:

a. must maintain on hand U.S. currency in order to maintain and finance their on-going narcotics business and illegal firearms activities;

b. often maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sale and distribution of controlled substances and/or firearms. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where traffickers/criminals have ready access to them -- frequently at their residences and stash houses, including in the garages at those locations;

c. often conceal in their residences and stash houses, including garages, caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities; and evidence of their illegal firearms activities;

d. often hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and stash houses, including attached and detached garages, for ready access and for concealment of these items from law enforcement authorities;

e. commonly maintain addresses or telephone numbers in books, papers, cellular telephones or electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates involved in the drug trafficking and/or illegal firearms activities. These persons also maintain photographs and videotapes of participants and associates in narcotic trafficking activities and illegal firearms activities, and property acquired as a consequence of narcotics trafficking and illegal firearms activities;

f. commonly have in their possession, or at their residences, including in garages at those residences, firearms, ammunition and/or other weapons that are used to conduct the illegal firearms activities and to protect and secure illegal drug trafficking activities; and

g. commonly have on their person and/or in their immediate possession evidence of their illegal activities, including narcotics, firearms, ammunition, proceeds of illegal firearms activities, narcotics proceeds, and cell phones used to facilitate their illegal activities.

142. Based upon my training and experience, I know that persons who traffic in illegal drugs and firearms often facilitate their criminal activity by using wireless telephones. Traffickers routinely keep their wireless phones on their person so they can stay in frequent communication with their associates, especially when a drug transaction has been planned, is being planned, or is imminent. When expecting a transaction, traffickers will stay in communication with their source of supply, their customers, and their other associates to facilitate their transactions. I have made arrests of drug and firearms traffickers, and it is very common that wireless telephones (in many instances, multiple telephones) are seized from the trafficker's person and/or possession.

143. Based upon my training and experience, I know that criminals often utilize their phones to store photographs, slides, or video movies of firearms, drugs and/or themselves, their co-conspirators, contraband, and assets purchased with illegal proceeds. Moreover, the simple possession of their cellphone (which usually houses the items described above) can provide invaluable location data to law enforcement via the data stored within the device as well as their cellphone's wireless provider. This data can provide law enforcement with detailed location data, both live and historical, pictures, videos, messages and other evidence to assist in the investigation. I also know that individuals engaged in criminal conduct will utilize their phones and various phone related features and applications, such as messenger and text messaging, to contact each other and arrange criminal conduct, or discuss it afterwards. Such individuals infrequently leave their cellphones behind when conducting criminal activity because it's necessary to coordinate with co-conspirators, provide GPS direction to the criminals for their illicit activity, be used to communicate with their customers and/or suppliers and provide a means of documenting. Individuals engaging in criminal conduct will also access internet-based applications with their phones, such as Facebook, Instagram and Telegram in furtherance of their illegal activities. Cell phones often are seized from criminals at the time of their arrests, and when criminal are arrested at their residences, their cell phones often are seized from their person and/or their residence.

## INFORMATION REGARDING CELLULAR TELEPHONES AND THE REQUESTED SEARCH WARRANT

144. Based upon my training, experience and information provided by other investigators, I know that persons who are involved in the illegal possession, use, sale and/or transfer of firearms and/or who traffic in illegal narcotics often facilitate their criminal activity by the use of cellular telephones. Persons involved in illegal firearms activities and/or illegal drug trafficking often store phone numbers of their customers, associates or their sources of firearms

and/or illegal narcotics within the electronic memory of their phones, including in contact lists, address lists, recent call lists and electronic calendars. Persons involved in illegal firearms activities and/or illegal drug trafficking often have their cell phones on their person, so they can stay in frequent communication with their criminal associates so as to keep track of their associates' whereabouts if a firearms transaction and/or a drug transaction has been planned and is imminent. When expecting a supply of narcotics, firearms and/or ammunition, these persons often will use cell phones to stay in communication with their source of supply to facilitate the drug transaction and/or illegal firearms transaction. Likewise, when expecting to sell narcotics or firearms to a customer, traffickers will use cell phones to stay in communication with their customers. It is the ready mobility of cell phones that result in their frequency as a tool of the drug trade and of illegal firearms activities. Here, I believe that the **Target Telephones** will contain evidence of the narcotics trafficking activities and/or illegal firearms activities of BAEZ, LEWIS, HUTLEY and MOODY.

145. Based on my training, experience, I know that cell phones have different capabilities that allow some of them to serve as a wireless telephone, digital camera and video recorder, portable media player, global positioning system (GPS) navigation device, a hand-held radio, and a personal digital assistant (PDA). In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the particular device, as well as evidence relating to co-conspirators with whom the device was in contact.

146. With regards to each of the **Target Telephones**, I request permission to enter and search the **Target Telephone** for evidence relating to the unlawful distribution and possession with intent to distribute narcotics and evidence of illegal firearms activities of BAEZ, LEWIS,

HUTLEY, MOODY and their associates. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of email communications between co-conspirators who distribute narcotics, or conspire to do so, and/or who are involved in illegal firearms activities. Also, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with the illegal possession, use, sale or transfer of firearms, and with the unlawful distribution of narcotics such as the businesses and locations used for distributing contraband, renting or leasing vehicles to transport narcotics, and storing illegal narcotics such as commercial storage facilities or other stash locations. Also based on my training and experience, wireless phones may contain videos and images of coconspirators, possible locations to ship, receive, or store narcotics and/or firearms, and the quantity of narcotics and/or shipping packages within which the narcotics are concealed, along with firearms and ammunition, which are generally considered tools of the trade in narcotics activity. Specifically, based on my training and experience, I know the following information tends to exist on wireless telephones, including phones used by those involved in the distribution of narcotics and in illegal firearms activities:

a. the telephone number, ESN number, serial number, and SIM card number of said telephone;

b. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

c. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

d. any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f. GPS coordinates, waypoints, destinations, location data, addresses, and location search parameters associated with GPS navigation software;

g. saved searches, locations, and route history in the memory of said device;

h. internet browsing history, to include, internet searches in the memory of said device; and

i. Images and videos in the memory of said device.

147. It is also requested that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze wireless telephones in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

148. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

149. The warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

150. As described above and in Attachment B to the requested search warrant, this application seeks permission to search and seize things that the device might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

151. Searching for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the ATF intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

152. Based on the information set forth herein, I submit that there is probable to support the requested criminal complaints and arrest warrants charging BAEZ, LEWIS, HUTLEY and MOODY with the specified Target Offenses.

153. In addition, based on the information set forth herein, I submit there is probable cause to believe that:

a. Evidence, fruits and/or instrumentalities of the Target Offenses will be located within the three target locations (**Target Premises #1, Target Premises #2** and **Target Premises #3**).

b. Evidence, fruits and/or instrumentalities of the Target Offenses will be found on or within the four target cell phones (**Target Telephone-1, Target Telephone-3, Target Telephone-3,** and **Target Telephone-4)**

c. Evidence, fruits and/or instrumentalities of the Target Offenses will be found on the persons of BAEZ, LEWIS, HUTLEY and MOODY, and in the DNA derived from buccal swabs taken from BAEZ, LEWIS, HUTLEY and MOODY.

154. Finally, investigators request that the Court order that all papers in support of the requested complaints and warrants, including the affidavit, the criminal complaints, the arrest warrants, the search warrants, the applications and related documents, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of

behavior, notify confederates, and flee from prosecution. In addition, premature disclosure could endanger investigators and other persons involved in this investigation.

Respectfully submitted

GREGORY MACKSOUD Digitally signed by GREGORY MACKSOUD Date: 2025.10.10 11:05:08 -04'00'

GREGORY MACKSOUD
Special Agent, Bureau of Alcohol, Tabacco, Firearms and Explosives

The truth of the foregoing affidavit has been attested to me over the telephone by ATF Special Agent Gregory Macksoud on October 10, 2025.

HON. ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE